AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



FILED
CLERK, U.S. DISTRICT COURT

10/16/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___jb___ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>SEYED ZIAEDDIN TAHERI ZANGAKANI,<br>SAEED TORAB ABTAHI,<br>ABBAS AMIN,<br>ISSA SHAYEGH,<br>MOJTABA DEHGHANI,<br>SARA SABRI,<br>REZA KARIMI,<br>SHANTIA CHUPRA,<br>SALIM HENAREH, and<br>KHALIL HENAREH,<br><br>Defendant(s) | Case No.  2:20-mj-05033-Duty<br><br><br><br>**REDACTED** |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning no later than in or about August of 1999 and continuing until at least in or about August of 2018, in

Los Angeles County, in the Central District of California, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a), (c) (IEEPA)<br>31 C.F.R. Part 560 (ITSR)<br>31 C.F.R. Part 561 (IFSR) | Conspiracy to violate the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, the Iranian Financial Sanctions Regulations ("IFSR"), 31 C.F.R. Part 561, and the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705(a), (c) |

//

//

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
_____
*Complainant's signature*

Jacob T. Frederick, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   10/16/2020
_____

Rozella A. Oliver
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT

I, Jacob Frederick, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint to charge and arrest warrants for the following individuals for conspiracy to violate the Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560, the Iranian Financial Sanctions Regulations, 31 C.F.R. Part 561, and the International Emergency Economic Powers Act, 50 U.S.C. § 1705(a), (c):

        a.   SEYED ZIAEDDIN TAHERI ZANGAKANI ("ZANGAKANI")

        b.   SAEED TORAB ABTAHI ("ABTAHI")

        c.   ABBAS AMIN ("AMIN")

        d.   ISSA SHAYEGH ("SHAYEGH")

        e.   MOJTABA DEHGHANI ("DEHGHANI")

        f.   SARA SABRI ("SABRI")

        g.   REZA KARIMI ("KARIMI")

        h.   SHANTIA CHUPRA ("CHUPRA")

        i.   SALIM HENAREH ("HENAREH")

        j.   KHALIL HENAREH ("KHALIL")

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless

1

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only and all dates are approximate.

## II. BACKGROUND OF AFFIANT

3.     I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since June 2014.  Immediately following my training at the FBI Academy in Quantico, Virginia, I was assigned to a Los Angeles Field Office white collar crime squad where I was responsible for investigating complex financial crimes to include securities fraud, wire fraud, mail fraud, Ponzi schemes, mass marketing schemes, and money laundering.

4.     I am currently assigned to the Counterintelligence Division, where I have been responsible for investigating acts of espionage, arms export control violations, counter-proliferation of dual-use goods (meaning goods with both military and civilian uses), and foreign intelligence activities involving official and unofficial state actors.  During my career as an FBI Special Agent, I have participated in numerous white collar crime and counterintelligence investigations, and I have received both formal and informal training from the FBI and other institutions regarding complex financial investigations and counterintelligence.

## III. SUMMARY OF PROBABLE CAUSE

5.     This investigation arises out of a nearly 20-year scheme to violate and evade U.S. national security controls against the Government of Iran and to violate and evade prohibitions against Iran's access to the U.S. financial system.

During the scheme, the conspirators created and used front companies, money service businesses, and exchange houses in Iran, Canada, the United Arab Emirates ("U.A.E."), Hong Kong, and elsewhere, and made false representations to financial institutions, to disguise more than $300,000,000 worth of transactions on behalf of Iran.

6.    This affidavit describes some of the unlawful transactions secretly executed on behalf of Iran by ZANGAKANI, ABTAHI, HENAREH, KHALIL, AMIN, SHAYEGH, DEHGHANI, SABRI, KARIMI and CHUPRA (among others) during the conspiracy.  As detailed below, there is probable cause to believe that:

        a.    Starting in 1999 and into the early 2000s, ZANGAKANI, HENAREH, and SHAYEGH began operating a business called "Persepolis Financial Services" in Encino, California that facilitated the illegal transfer of U.S. dollars on behalf of Iran.  ZANGAKANI, HENAREH, SHAYEGH later left the United States and moved to Canada and the U.A.E., where they – along with KARIMI and other coconspirators - continued to secretly facilitate U.S. dollar transactions on behalf of Iran using front companies with the names "Persepolis" and "Rosco," among others.

        b.    In 2012, ZANGAKANI and AMIN conspired to wire $20,000,000 to Malaysia in order to purchase piping equipment on behalf of an Iranian oil company.  The conspirators used a front company to complete the transaction, which was processed through a U.S. correspondent bank account (i.e., a U.S. bank account that effectively converts foreign currency into U.S. dollars for withdrawals and deposits on behalf of foreign banks) held by

3

Standard Chartered Bank in New York.  Also in 2012, ZANGAKANI, AMIN, HENAREH, and KHALIL used a Hong Kong-based front company to secretly buy two $25 million oil tankers on behalf of Iran from a Greek businessman; the businessman was later sanctioned by the United States for using Iranian money to acquire oil tankers (including the two described in my affidavit below) and to help Iran ship crude oil in violation of U.S. and European Union sanctions.

c.    In 2013, two of the conspirators - ZANGAKANI and DEHGHANI - defrauded a branch or agency of a foreign financial institution in the U.A.E. by preparing a fraudulent invoice and making false statements indicating that a U.S. dollar transaction was undertaken on behalf of a front company in the U.A.E., when the true purchaser of the equipment was in fact an Iranian oil and gas company.  Once again, the transaction was processed through the foreign bank's correspondent U.S. dollar account located in New York.

d.    Furthermore, in 2016, ZANGAKANI, ABTAHI, CHUPRA, and SABRI conspired to wire millions of dollars through the U.S. financial system in order to transact with a South Korean equipment manufacturer on behalf of Iran, instructing the manufacturer not to mention Iran in any paperwork exchanged with financial institutions that would process the transaction.

e.    Finally, throughout the conspiracy, the conspirators surreptitiously transferred thousands of dollars into the Central District of California on behalf of Iran, including $66,766 transferred by ZANGAKANI to a Santa Monica-

based company to acquire electronic equipment at the direction of an Iranian business associate in 2016.

    7. A chart providing a visual summary of the key coconspirators and entities described throughout my affidavit is attached hereto as **Exhibit 1**.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Statutory Background: U.S. Sanctions Against Iran**

    8. The International Emergency Economic Powers Act ("IEEPA") authorizes the President to deal with "unusual and extraordinary threat[s] . . . to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats. <u>50 U.S.C. § 1701(a)</u>. Since 1979, and through the present day, U.S. presidents have repeatedly declared that the actions and policies of the Government of Iran ("GOI") pose a threat to the United States' national security including, among other actions, the GOI's pursuit of nuclear weapons and its sponsorship of terrorism.

    9. Section 1705 of the IEEPA defines the scope of unlawful activity under the statute: "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." <u>50 U.S.C. § 1705(a)</u>. It also provides a criminal penalty for anyone who, among other things, willfully conspires to commit any of the unlawful acts described in Section 1705(a). <u>See</u> <u>id.</u> § 1705(c).

    10. Since 1979, the United States has adopted a series of statutes, executive orders, and regulations designed to check the national security threat posed by the GOI's policies and

actions, including the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560, and the Iranian Financial Sanctions Regulations ("IFSR"), 31 C.F.R. Part 561. The ITSR target, among other things, exports from the United States or by U.S. persons for the benefit of Iran. Section 560.204 of the ITSR prohibits, among other things "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." § 560.204. Similarly, the ITSR prohibits the reexportation from a third country, directly or indirectly, by a person other than a United States person, of any goods, technology, or services that have been exported from the United States if undertaken with knowledge that the reexportation is intended specifically for Iran or the Government of Iran. See § 560.205. The ITSR provides that the transfer of funds, directly or indirectly, from the United States by a U.S. person to Iran or the Government of Iran is a prohibited export, re-export, sale, or supply of services to Iran or the Government of Iran. See § 560.427(a).

11. In addition, section 560.203 of the ITSR states that "any transaction on or after the effective date [meaning 1979] that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited," and that "[a]ny conspiracy formed to violate any of the prohibitions set forth in this part is prohibited."

12. The IFSR, which were enacted in part under the authority of IEEPA, implement, among other things, a series of legislative and executive steps taken to attempt to restrict the Government of Iran, its Islamic Revolutionary Guard Corps', or any of its agents or affiliates access to U.S. currency, including (i) the National Defense Authorization Act for Fiscal Year 2012 (the "NDAA"), which allowed for sanctions to be imposed on foreign financial institutions that were determined by the Secretary of Treasury to knowingly have conducted or facilitated significant financial transactions with the Central Bank of Iran or a designated Iranian financial institution, and (ii) the subsequently enacted Iranian Threat Reduction and Syria Human Rights Act of 2012 ("ITRA"), which further restricted Iran's access to its oil proceeds, for example, by directing that sanctions should be imposed on foreign financial institutions that did not restrict the use of Iranian oil proceeds to fund bi-lateral trade (i.e., trade between the institution's host country and Iran). See 31 C.F.R. Part 561. Any conspiracy formed to violate the IFSR is prohibited by § 561.701(b).

**B. Background on Iranian Sanctions Avoidance**

13. Based on my training and experience and an October 11, 2018, published advisory obtained from the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN"),[1] I know the following:

---

[1] FinCEN's mission includes assisting U.S. financial institutions to better detect illicit and malign activities used by Iran to exploit the financial system.

a. Iran uses front and shell companies to exploit financial systems around the world to generate revenue and transfer funds in support of terrorist groups, ballistic missile development, human rights abuses, support for the Syrian regime, and other destabilizing actions targeted by U.S. sanctions.

b. Iran uses exchange houses and trading companies in other countries to act as money transmitters in processing fund transfers through the United States that are not authorized by the U.S. Office of Foreign Assets Control ("OFAC"). OFAC is a U.S. government agency component of the United States Treasury Department that administers and enforces economic and trade sanctions in support of U.S. national security and foreign policy.

c. Iranian actors use front and shell companies around the world to procure technology and services in order to evade sanctions, thereby obtaining goods and services related to currency counterfeiting, dual-use equipment (meaning equipment having both civilian and military applications), and the commercial aviation industry. Iran-related actors have attempted to purchase printing machinery and raw materials to print counterfeit bank notes in support of the Islamic Revolutionary Guards Corps' Quds Force ("IRGC-QF"), an extraterritorial paramilitary force. Iran-related actors frequently use intermediary companies to obfuscate both the true purchaser and the final recipient of goods and services.

**C. Background on the Conspirators**

14. Based on my review of financial records, online business databases, domain subscriber data, e-mail account

records, and publicly-available information provided by the entities below, I know that ZANGAKANI, HENAREH, and KHALIL have each owned or been employed by the following companies in Canada and the U.A.E. that are associated with a money services business in Iran:[2]

### The ROSCO ENTITIES' Operation in the U.A.E. and Canada

a. ZANGAKANI[3] owns 5% of Rosco Trading LLC ("ROSCO TRADING"), a company based in the U.A.E. that purportedly assists Canadian suppliers with the purchase of products, raw materials, heavy industrial equipment, and special machinery. HENAREH owns 44% of ROSCO TRADING.

b. Rosco Trading International Ltd. ("ROSCO INTL") is a currency exchange business located in Toronto, Canada, which provides exchange services for at least 40 international currencies. HENAREH is the principal and president of ROSCO INTL; KHALIL[4] serves as a compliance and operations employee.

c. ROSCO INTL is co-located with and does business as Persepolis International Ltd. ("PERSEPOLIS"), a registered

---

[2] Because the conspirators routinely conversed in both the Persian (commonly referred to as "Farsi") and English languages, this affidavit does not distinguish between which language was used in a given email or portion of a conversation; the Farsi-language translations in this affidavit are not verbatim and were provided to me by an FBI agent fluent in Farsi.

[3] Based on my review of thousands of emails sent and received by ZANGAKANI, I know that he is often referred to by the names "Zia," "Taheri," and "Ziya," among other names. For ease of reference, I use solely ZANGAKANI throughout this affidavit.

[4] Based on their shared surnames ("Salim Henareh" and "Khalil Henareh") and their business connections, I believe that KHALIL and HENAREH are related.

Money Services Business ("MSB") in Canada.[5]  HENAREH is the president of PERSEPOLIS, and KHALIL was the Information Technology and Operations Manager at PERSEPOLIS.

   d. SHAYEGH is a citizen of Iran and is a foreign currency "specialist" for PERSEPOLIS.

   e.  According to the WHOIS database, KHALIL registered and operated web domains for PERSEPOLIS and other companies, as discussed below.[6]

   f. ABTAHI is a national of Canada and Iran and serves as the Vice President of ROSCO INTL.  In August of 2018, ROSCO INTL announced on its webpage that, due to "added sanctions pressures," ROSCO INTL would not accept any money transfer requests to or from Iran "until further notice."

   g. ROSCO TRADING shares a physical address with Rosco Investment International LLC ("ROSCO INVESTMENT") in the U.A.E.

   h. Although ROSCO INVESTMENT's website – "roscoinvestment.com" – is no longer active, historical subscriber information shows that KHALIL was the registrant contact, technical contact, administrative contact, and billing contact for the ROSCO INVESTMENT domain name.  In addition, the

---

   [5] An Apple account registered under ZANGAKANI's name was also subscribed to using the same telephone number of ROSCO INTL and PERSEPOLIS.

   [6] WHOIS is a publicly available website that allows users to query databases that store the registered users or assignees of an Internet resource, such as a domain name, an IP address block, or an autonomous system.  WHOIS shows that the website "persepolis.com" was registered by KHALIL on behalf of PERSEPOLIS.  The listed address for the registrant matched the address for ROSCO INTL.

subscriber contact information provided by KHALIL for the ROSCO INVESTMENT domain name is identical to the listed telephone number and address of ROSCO INTL and PERSEPOLIS in Canada.

i.     Collectively, ROSCO TRADING, ROSCO INTL, PERSEPOLIS, and ROSCO INVESTMENT, are hereinafter referred to as the "ROSCO ENTITIES."

j.     KARIMI is an employee of a money exchange in the U.A.E. and, as detailed further below, provided advice to ZANGAKANI and the ROSCO ENTITIES regarding how to evade sanctions on Iran.

**The ROSCO ENTITIES' Association with ROSCO EX in Iran**

k.     Notwithstanding KHALIL's employment with the ROSCO ENTITIES and ROSCO INTL's public statements that it does not do business with Iran, KHALIL registered the website for an Iranian currency exchange business, Rosco Exchange ("ROSCO EX"), which publicly displays and advertises the "Rosco," "Persepolis," and "Henareh" names.  ROSCO EX is located in Tehran, Iran.

l.     In particular, KHALIL is the "listed registrant" of the ROSCO EX website "sarafipersepolis.ir."  The internet country extension for Iranian websites is ".ir," and the domain holder for the ROSCO EX website is the "Payam Avarane Khorshid Company" located in Shiraz, Iran.  The company's online profile displays "ROSCO EXCHANGE, Persepolis Henareh."  Several publicly-available LinkedIn profiles also identify ROSCO EX as an "employer" based in Tehran, Iran.

m.     Like the subscriber information provided by KHALIL for the ROSCO INVESTMENT domain, the subscriber contact

information provided by KHALIL for the ROSCO EX "sarafipersepolis.ir" domain matched the telephone number and address of ROSCO INTL and PERSEPOLIS in Canada.

**Additional Coconspirators and Petrochemical Companies in Iran**

15. Based on my review of emails and digital files seized pursuant to federal search warrants issued in Case Nos. 20-MJ-00731, 20-MJ-00734, 19-MJ-04009, 19-MJ-04007, and 19-MJ-04008, (the "Federal Search Warrants"),[7] LinkedIn profiles, and Iranian business websites, I know that some of the remaining coconspirators are or have been directly employed by companies located in Iran:

    a. AMIN is a citizen of Iran and the Credit Finance Manager for Iran-based Supplying Petrochemical Industries Part Equipment and Chemical Engineering Company ("SPEC").

    b. SABRI is a "Commercial Expert" for Compressor Tech Trading ("COMPRESSOR TECH"), a company purportedly based in the U.A.E. but that actually operates in Iran, as detailed further below.

    c. DEHGHANI is a citizen of Iran and an employee within the financial department of Iran-based Fateh Sanat Kimia ("FATEH SANAT").

**D. ZANGAKANI, HENAREH, and SHAYEGH are Linked to a California Business that Illegally Transferred Money to Iran in 2003**

16. Based on my review of California state court records and a report prepared by the California Attorney General's office, I know the following:

---

[7] My affidavits in support of the Federal Search Warrants are incorporated by reference and attached hereto as **Exhibit 2.**

a.    Beginning in 1999, HENAREH served as President of Persepolis Financial Services, Inc. ("PERSEPOLIS FINANCIAL"), a corporation based in Encino, California and incorporated on August 6, 1999.[8]  In 2003, SHAYEGH, the vice president of PERSEPOLIS FINANCIAL, was convicted in Los Angeles County Superior Court of violating Section 1823 of the California Financial Code for transmitting money to Iran, in Case No. LAVLA040619-01.

b.    The year before SHAYEGH's conviction, a California state law enforcement undercover officer ("UC") contacted PERSEPOLIS FINANCIAL at its publicly listed telephone number in Encino.  The UC spoke with a man who identified himself as "Zia," whom I believe to be ZANGAKANI.[9]

c.    During the call, "Zia" told the UC how to surreptitiously send money from the United States to Iran and provided the UC with an Iranian currency to U.S. dollar exchange rate.  "Zia" also directed the UC to PERSEPOLIS FINANCIAL in Encino, where the UC ultimately met SHAYEGH in-person.

17.  ZANGAKANI and SHAYEGH continued to arrange U.S. dollar transactions on behalf of Iran long after SHAYEGH's 2003 criminal conviction in California.  For example, based on my review of emails obtained pursuant to the Federal Search Warrants, I know that:

---

[8] The conspirators used the spellings of both "Persepolis" and "Perspolis," which is an alternate English-language, phonetic spelling for the Farsi word "Persepolis."

[9] As detailed further below, ZANGAKANI used the name "Zia" to register multiple e-mail accounts and referred to himself as "Zia" in emails with SHAYEGH, and on multiple business websites.

      a.   On January 17, 2012, ZANGAKANI and SHAYEGH[10] received an email about "American Hawalas/ Transactions"[11] from an employee of ROSCO INTL.  The email indicated that ZANGAKANI would be "introduced" to "American customers" and provided instructions on how to calculate the Toman rate, a superunit of the official currency of Iran, the Rial, and how to add a Toman fee for American transactions.[12]

      b.   On August 8, 2012, ZANGAKANI emailed SHAYEGH a copy of an invoice for a U.S.-dollar payment made on behalf of an Iranian company for gas and oil:

      i.   In particular, ZANGAKANI forwarded a request from a U.A.E. trading company[13] for an "invoice" on "letterhead"

---

[10] ZANGAKANI received the email at ziya2@yahoo.com, which is subscribed to under ZANGAKANI's name.  SHAYEGH received the email at ishayegh@yahoo.co.uk, which I know to be used by SHAYEGH because this email address routinely uses the full name "ISSA SHAYEGH" in the to/from section of the header and, on one occasion, was used to send SHAYEGH's Iranian passport to ZANGAKANI.

[11] Based on my training and experience, I know that "Hawala," a word of Arabic origin also used in other languages, including Farsi, can refer to an informal value transfer system ("IVTS") designed to evade sanctions in which an individual in a sanctioned country (for example) receives money for the purpose of facilitating an equivalent value payable to a third party in another geographic location (e.g., by a coconspirator located in the United States).  However, based on my conversations with an FBI agent fluent in Farsi, I know that "Hawala" in Farsi generally translates to "transaction" and does not always necessarily refer to an IVTS.

[12] Based on my training and experience, I know that one toman is equivalent to ten rials, the official currency of Iran.

[13] Based on my training and experience, I know that U.A.E. trading companies are often used by individuals and entities acting on behalf of Iran to send and receive U.S. dollar payments because U.S. dollars cannot be wired directly to Iran as a result of economic sanctions.

that would enable the trading company "to arrange [for] the transfer of funds directly to your account."

       ii.   The email included a commercial invoice from OIL COMPANY 1,[14] an Iranian oil and gas company, in the amount of $343,516.46 of "Gas Oil – Type – A" and "Gas Oil – Type – B" for a shipment from Erbil, Iraq to Heraat, Afghanistan.

      c.   On May 14, 2014, ZANGAKANI emailed SHAYEGH two business cards (one in Farsi and one in English) identifying SHAYEGH as the "International Specialist of the Foreign Currency" for PERSEPOLIS. In addition to offices in Toronto and Dubai, SHAYEGH's business cards stated that PERSEPOLIS has an office in Tehran, Iran.[15]

### F.   ZANGAKANI, KARIMI, ABTAHI, and AMIN Discuss Economic Sanctions on Iran

18.   Based on my review of emails obtained pursuant to the Federal Search Warrants, I know the following:

      a.   On June 18, 2012, KARIMI emailed ZANGAKANI with advice regarding how to surreptitiously transfer funds from Iran to accounts in Canada and evade economic sanctions. KARIMI identified two important factors that would help disguise any transfer:

---

[14] OIL COMPANY 1 maintains a LinkedIn page that describes the company as located in Iran and an Iran-based website shows that OIL COMPANY 1 is registered to conduct business in Iran.

[15] In 2014, ZANGAKANI and SHAYEGH also exchanged an email about a U.S. dollar transfer into the Central District of California. On March 10, 2014, ZANGAKANI emailed SHAYEGH a Western Union receipt for a $5,000 transfer from an individual in the U.A.E. to a person in Los Angeles.

i.   According to KARIMI, if the transfer was initiated from a suspicious sender and the amount exceeded $40,000,[16] the bank would block the transaction and investigate the sender and the receiver.  KARIMI advised ZANGAKANI to keep the amount below the $40,000 threshold and to use a reliable sender.

ii.   KARIMI also provided ZANGAKANI with instructions on how to describe the senders and beneficiaries in fund transfers.  If the person sending the money did so on behalf of a currency exchange entity, KARIMI recommended that ZANGAKANI describe the person as the "father" of the account holder.  Moreover, KARIMI advised ZANGAKANI to state that the funds were transferred from any country other than Iran because sanctions would create problems if the transfers declared that the funds were provided from Iran.

b.   On December 12, 2012, ABTAHI sent ZANGAKANI an email attaching an OFAC publication that provided an overview of OFAC regulations involving sanctions against Iran. The document was titled, "What You Need To Know About U.S. Economic Sanctions."

c.   In the email, ABTAHI directed ZANGAKANI to the top of page 4 of the attachment, which displayed a list of several Iranian companies determined to be the Government of Iran, as defined in 31 C.F.R. § 560.304.

d.   The list of companies included NPC INTERNATIONAL LIMITED ("NPC") and the PETROCHEMICAL COMMERCIAL COMPANY

---

[16] It is unclear from the email whether KARIMI was referring to Canadian or U.S. dollars.

("PCC"), including its affiliates; NPC and PCC are both energy companies based in Iran.  Additionally, the top of page 4 included a paragraph detailing 31 C.F.R. Part 535, the Iranian Assets Control Regulations.  (Agent's note:  During the conspiracy, ZANGAKANI repeatedly engaged in email conversations with representatives of NPC and PCC regarding the purchase of goods and the transfer of funds.  In ZANGAKANI's emails with NPC and PCC, employees of both companies routinely included signature blocks indicating that the companies operate in Iran.)

> e.   ZANAGAKANI forwarded ABTAHI's December 12, 2012 email to AMIN who, as noted above, is an employee of the Iranian petrochemical company SPEC.  According to emails seized pursuant to the Federal Search Warrants and a Memorandum of Understanding dated March 5, 2016, SPEC is a "subsidiary" of Iran's PCC, and ROSCO INVESTMENT performs financial services on behalf of SPEC.

> f.   On June 4, 2013, ABTAHI emailed ZANGAKANI a U.S. Department of the Treasury website link and stated in Farsi, "look at this chart.  It's new."  The link provided a U.S. Treasury PDF document titled, "The Execution of Imam Khomeini's Order ("EIKO"), International Financial Network," which was described as a major network of front companies controlled by Iranian government leadership and tasked with evading U.S. sanctions.  According to the PDF, the stated purpose of the network is to generate and control massive, off-the-books investments, shielded from the view of the Iranian people and international regulators.

> g.   On July 19, 2016, ABTAHI sent ZANGAKANI an email with an attachment and stated, "Please see after page 35.  This

became effective after June 16, 2010." The attachment was OFAC's Specially Designated Nationals and Blocked Persons List ("SDN") list. Page 35 of the document was the start of Iranian companies added to the OFAC SDN list on June 16, 2010. The heading for the list was highlighted in yellow. Beginning on page 37, multiple Iran-based companies were highlighted, including the NATIONAL IRANIAN OIL COMPANY ("NIOC") and PCC.

      h.   On July 19, 2016, ZANGAKANI forwarded a U.S. Department of Treasury link for OFAC enforcement regarding NPC and PCC to AMIN at SPEC.

      i.   In addition, ZANGAKANI saved a photograph dated March 26, 2019 of a page from a Reuters news article titled "U.S. Sanctions Firms Funding IRGC" on his iCloud account. The article stated that the U.S. had recently imposed new sanctions on a network of companies and people in Iran, Turkey, and the U.A.E. who were funding IRGC operations.

    **G.   ROSCO TRADING Sends Millions of U.S. Dollars to Malaysia on Behalf of Iranian Oil Companies**

    19.   Based on my review of bank records, emails obtained pursuant to the Federal Search Warrants, and publicly-available online business databases, I know that between April and August of 2012, ZANGAKANI and AMIN used ROSCO TRADING to send eleven wire transfers totaling approximately $20 million to International Oil Design and Construction ("IODC") in Malaysia.[17] The correspondent bank that processed the U.S. dollar transaction was Standard Chartered Bank in New York. As

---

    [17] Online news publications describe IODC as a unit of the Oil Design and Construction Company group of Iran.

detailed below, these U.S. dollar transfers were executed on behalf of two Iranian oil companies:  SPEC, where AMIN served as the credit manager, and Oil Industries Engineering & Constructions ("OIEC"), which is based in Tehran, Iran:

a.    On April 23, 2012, AMIN emailed ZANGAKANI about "payment splits for IODC."  AMIN stated, "Pls find attached the invoice for transfer of USD 2 mln."  The email included an attachment for an IODC invoice of $2,000,000.  The listed customer/payee was ROSCO TRADING LLC.

b.    AMIN's email to ZANGAKANI included a forwarded discussion between AMIN and the IODC Managing Director about how best to send funds to IODC:

i.    In the forwarded message, AMIN told IODC's managing director that "[we've] received orders to transfer some funds to yr good company, we would like to know how to split the amount (max. payable for each payment) in order to not create any possible problems for you."

ii.    IODC's managing director responded, "[w]e can receive any amount only if it is justified by an invoice. Please be kind enough to send us the exact amount and the name of the transferring company so that we then issue invoices to that company.  I suggest to send the funds in different amounts between 2 million and 10 million."

iii. On April 24, 2012, ROSCO TRADING LLC sent $2,000,000 to IODC via wire transfer.

c.    On November 1, 2012, ZANGAKANI received an email attaching a spreadsheet with a tab titled, "Rosco Investment International LLC, Statement of Account."  The spreadsheet

described multiple apparent wire transfers, including a wire sent on April 24, 2012, to "IDOC [sic] SDN BHD."[18]  According to the spreadsheet, the original April 24, 2012 wire transfer amount was listed as 7,397,600 U.A.E. Dirhams ("AED"), which equated to $2 million United States Dollars ("USD").  The transfer included a .90% transfer fee.

d.    Between April 24, 2012 and August 2, 2012, IODC received a total of 11 wire transfers from ROSCO TRADING LLC which aggregated to $20,089,750.

e.    In addition, ROSCO TRADING sent $6,000,000 to IODC on behalf of two Iranian oil companies:  SPEC and OIEC.

i.    In particular, on October 11, 2012, AMIN sent an email to ZANGAKANI titled "Fw: Service Invoice - SPEC." AMIN stated, "Pls find attached the required invoices."

ii.    The email attached four IODC commercial invoices for "piping material" in the amount of $6,000,000.  The listed "customer" was OIEC with an address in Tehran, Iran. In another email forwarded to ZANGAKANI later that same day, AMIN asked the managing director of IODC in Malaysia to issue the invoice to a different entity instead of the "existing" company.

f.    In his email, AMIN attached new signed invoices for the $6,000,000 purchase matching the prior invoices except for the customer.  The new invoices removed OIEC, its address in Tehran, and deleted any mention of ROSCO TRADING LLC in the

---

[18] "Berhad" is a suffix used in Malaysia to identify a public limited company.  The suffix "Sendirian Berhad (SDN BHD)" identifies a private limited company.

description block, replacing the "customer" with a different entity, HAMILTON FAHO TRADING ("HAMILTON FAHO"), purportedly located outside of Iran. According to emails seized pursuant to the federal search warrants, HAMILTON FAHO is located in the U.A.E. In July of 2012, a Mashreq Bank employee sent ZANGAKANI a letter describing ZANGAKANI as HAMILTON FAHO's "authorized representative."

20. Bank records show that HAMILTON FAHO sent approximately $10,000,000 USD between October 11, 2012 and December 10, 2012 to IODC (including a total of $6,000,000 between December 5 and December 10, 2012). The transactions were sent from HAMILTON FAHO's Emirates NBD account in the U.A.E. to IODC's account in Malaysia. The correspondent U.S. dollar transaction was processed by Standard Chartered Bank in New York.

**H. The Conspirators Use a Front Company to Secretly Buy Two Oil Tankers on Behalf of Iran in 2012**

21. Based on my review of a U.S. Department of the Treasury publication, I know the following:

a. On March 14, 2013, the United States imposed sanctions on a Greek businessman ("BUSINESSPERSON A"). According to the Treasury publication, BUSINESSPERSON A repeatedly helped Iran evade U.S. sanctions by laundering Iranian funds to purchase multiple oil tankers and disguising the Iranian origin of oil transported on the vessels.

b. Specifically, BUSINESSPERSON A served as president of SHIPPING COMPANY 1 and used his shipping company, as well as several front companies, to purchase oil tankers

while disguising the fact that the tankers were being purchased on behalf of the National Iranian Tanker Company ("NITC"). BUSINESSPERSON A's front companies obscured the fact that the vessels, which are capable of carrying roughly $200 million of oil per shipment, are the property of the Iranian government. Another front company, SHIPPING COMPANY 2, operated the vessels that BUSINESSPERSON A and SHIPPING COMPANY 1 purchased on behalf of NITC with the aim of loading them with Iranian oil supplied by the National Iranian Oil Company ("NIOC").

     c.   According to the Treasury publication, two of the oil tankers acquired by BUSINESSPERSON A on behalf of NITC were the "OCEAN PERFORMER" and the "ZAP," both of which were Liberian-flagged ships. The OCEAN PERFORMER's International Maritime Organization ("IMO") number – a unique identifier for ships, registered ship owners, and management companies – was 9013749. The ZAP's IMO number was 9005235.[19]

22.  Based on my review of emails seized pursuant to the Federal Search Warrants, I know that, in 2012, the conspirators – including HENAREH, KHALIL, ZANGAKANI, and AMIN – used a front company to acquire these exact same vessels (the OCEAN PERFORMER and the ZAP) from BUSINESSPERSON A on behalf of SPEC in Iran. Although the vessels used different names at the time of the

---

[19] According to the IMO, ship identification numbers were adopted to enhance maritime safety, pollution prevention, and to facilitate the prevention of maritime fraud. IMO numbers remain unchanged upon transfer of a ship to other flags and are inserted into the ship's certificates; in other words, the IMO number is never reassigned to another ship and is shown on the ship's certificates.

2012 sale, I know that they are the same ships because they share identical IMO numbers:

a.    First, no later than April of 2012, KHALIL and HENAREH began operating a Hong Kong-based front company called TOTAL EXCELLENCE LIMITED ("TOTAL EXCELLENCE").  In particular, on April 25, 2012, KHALIL emailed HENAREH and stated that he "completed [the] Total Excellence website.  The address to view the site is the following address: http://www.totalexcellenceltd.com."  ZANGAKANI and ABTAHI, among others, were copied on the email.  According to an annual income return document prepared by a Hong-Kong based CPA in 2014, HENAREH served as the "director" of TOTAL EXCELLENCE LIMITED.[20]

b.    Second, ZANGAKANI and AMIN used TOTAL EXCELLENCE LIMITED and ROSCO INVESTMENT to secretly facilitate the U.S. dollar transactions with BUSINESSPERSON A on behalf of SPEC in Iran.  For example:

i.    On August 13, 2012, BUSINESSPERSON A emailed ZANGAKANI with information regarding a bank account in Athens, Greece capable of accepting U.S. dollar wire transfers. ZANGAKANI then forwarded this information to AMIN at SPEC.  AMIN responded and stated, "We'll correct our letter to you with USD A/C number."

ii.    On August 23, 2012, BUSINESSPERSON A emailed ZANGAKANI and told him that BUSINESSPERSON A's Athens-based bank was cross-checking the source of funds being wired into the

---

[20] According to an attachment with an overview of various bank accounts seized from ZANGAKANI's emails, TOTAL EXCELLENCE LIMITED maintained a company email address of "salim@perspolis.com" with the listed contact as "HENAREH S."

account by TOTAL EXCELLENCE LIMITED.

        iii. In response, ZANGAKANI wrote to BUSINESSPERSON A with a description of TOTAL EXCELLENCE LIMITED's purported business operations; in particular, ZANGAKANI claimed that TOTAL EXCELLENCE LIMITED was a "global company in the construction machinery industry" that supplied "heavy equipment brands." ZANGAKANI also claimed that TOTAL EXCELLENCE LIMITED invested in construction and transportation businesses, including a "shipping fund" to acquire an oil tanker.

        iv. Over the next several days, ZANGAKANI and BUSINESSPERSON A exchanged emails regarding invoices that ZANGAKANI needed to provide to his "bank of china" for the U.S. dollar wire transfers for the two oil tankers.

        v. On August 28, 2012, BUSINESSPERSON A emailed ZANGAKANI two invoices (on SHIPPING COMPANY 1 letterhead) for the purchase of the following two oil tankers: (1) the YIOMARAL, with IMO Number 9005235 (identical to the ZAP) and a total purchase price of $26,150,000; and the OLYMPIC LOYALTY, with IMO Number 9013749 (identical to the OCEAN PERFORMER) and a total purchase price of $25,500,000. According to the invoices, TOTAL EXCELLENCE would wire an initial payment of $942,200 USD as part of the acquisition of the OLYMPIC LOYALTY, and an initial payment of $1,212,800 USD as part of the acquisition of the YIOMARAL.

        c. On September 7, 2012, ZANGAKANI received an email with a spreadsheet regarding ROSCO INVESTMENT's "statement of account" for SPEC (among other transactions). The spreadsheet

included an August 13, 2012 line item indicating that the SPEC
account was debited "2,155,000.00," the exact combined total
U.S. dollar value of the initial payments wired to
BUSINESSPERSON A for the two oil tankers above.  The
"particulars" column stated, "PIT-SP//299-USD-1,212,800+942,200-
PARTIAL-[SHIPPING COMPANY 1] B/O SPEC IR Approved."

### I.  The ROSCO ENTITIES Send Over $300 Million from the U.A.E. to Exchange Houses and MSBs in the West

23.  In addition to the transactions above, based on my
review of financial records, I know that between August 2011 and
January 2014, the conspirators used ROSCO TRADING to send 696
wire transfers totaling over $208 million to different exchange
houses and MSB services around the world.  During this same time
period, ROSCO TRADING received only three wire transfers
totaling about $1.7 million, including $982,000 from the Korea
Development Bank for a "return of same day fund" and $780,000
from "VTI USD MARGIN FX CLIENT MONIES" (London, England) on
behalf of a money services business.[21]

24.  Of the $208 million in wire transfers, $59,930,712 was
sent between two of the ROSCO ENTITIES -- in particular, from
ROSCO TRADING in the U.A.E. to ROSCO INTL in Canada.  Moreover,
despite descriptions of ROSCO TRADING on U.A.E.-based websites
as specializing in "engines" and "industrial plant equipment and

---

[21] The ROSCO ENTITIES' bank accounts (as well as the
accounts for the U.A.E. and Hong Kong companies linked to
ZANGAKANI and discussed further below) are held outside of the
United States.  Accordingly, based on the investigative process
used to date, the FBI has only obtained records of U.S.-dollar
denominated transactions that must pass through correspondent
financial institutions in the United States.  Wire transfers in
foreign currencies or cash deposits or withdrawals are not
included in such records.

spare parts," ROSCO TRADING identified the purpose of almost all of the wire transfers during this period as "invest[ing] in [the] financial market."

25.  The conspirators, using the ROSCO ENTITIES, also sent millions of dollars into the United States.  Between November 2011 and April 2014, for example, ROSCO INTL sent 69 wire transfers totaling $1,664,062 to individuals, telecommunication companies, private businesses, and an exchange house in the United States.  Similarly, between January 2012 and continuing through August 2013, ROSCO TRADING wired $4.3 million into the United States; ROSCO TRADING sent funds to many of the same entities that received money from ROSCO INTL, as well as EXCHANGE HOUSE 1, a money services business based in Woodland Hills, and an escrow company based in Beverly Hills.

26.  Based on my training and experience, I know that in order to circumvent U.S. sanctions, Iranian-based government agencies, businesses, and individuals frequently transfer funds surreptitiously from Iran to the U.A.E. before sending money to third-party exchange houses and MSBs in countries such as Canada, Australia, Great Britain, New Zealand, and the United States.  The transfer of substantial assets between two of the ROSCO ENTITIES – as well as the ROSCO ENTITIES' surreptitious U.S. dollar transfers to Malaysia, Greece, and other countries on behalf of Iranian oil companies described above and further below – is consistent with patterns of Iranian sanctions avoidance and money laundering.

**J.    The Conspirators Defraud Mashreq Bank to Evade U.S. Sanctions**

27.    Based on my review of bank records and emails obtained pursuant to the Federal Search Warrants, I know that, during the conspiracy, DEHGHANI and ZANGAKANI also schemed to defraud the New York branch of Mashreq Bank, a foreign financial institution, by falsely claiming that a U.S. dollar wire transfer was executed on behalf of a U.A.E. company, when in fact the U.S. funds were wired on behalf of an Iranian petrochemical company to purchase piping material from Japan. In particular:

a.    Emails show that DEHGHANI is an employee in the financial department of FATEH SANAT, an Iranian petrochemical company, as noted above.

b.    On December 4, 2013, DEHGHANI sent ZANGAKANI an email titled, "very very urgent." The email included a list of companies with bank account details and amounts in U.S. dollars, Euro, and AED. One of the companies was a Japan-based company with the amount $360,520.99 USD.

c.    On December 13, 2013, ZANGAKANI sent an email to DEHGHANI titled "Fw: FATEH SANAT." In the body of the email ZANGAKANI stated, "please find the attachment." The attachment was a "statement of account" for "FATEH SANAT" in multiple currencies. According to the statement, on December 9, 2013, FATEH SANAT's account was debited $360,520.99 for a payment to the Japanese company.

    d.   On December 14, 2013, ZANGAKANI received an email
from a representative of Mashreq Bank (which is the oldest
privately-owned bank in the U.A.E., according to its website):

         i.   The Mashreq Bank representative asked
ZANGAKANI for additional information related to a transaction in
which EURAMIKA GENERAL TRADING FZE[22] wired $360,520.99 USD to a
Japan-based company.  In the email, the Mashreq representative
informed ZANGAKANI that the payment was on hold and asked
ZANGAKANI to "provide attestation that funds are not related to
Iran, or any other OFAC sanctioned country."

    e.   Immediately after receiving the Mashreq Bank
representative's email on December 14, ZANGAKANI emailed
DEHGHANI.  The email was titled "urgent" and stated "we need
invoice for your 360,520.99 usd sending to [a Japan-based
company]."  Additionally, ZANGAKANI stated, "Please make invoice
for EURAMIKA TRADING FZE."

    f.   On December 16, 2013, DEHGHANI provided an
invoice which listed EURAMIKA TRADING FZE in the U.A.E. as the
purchaser.  The invoice was for the purchase of SMLS TUBE.[23]
DEHGHANI's own email signature block, however, stated that he

_____

    [22] EURAMIKA GENERAL TRADING FZE was registered in the U.A.E.
on January 22, 2013.  According to records in ZANGAKANI's
digital accounts obtained pursuant to the Federal Search
Warrants, EURAMIKA GENERAL TRADING FZE is controlled and managed
by a Canadian national, EMPLOYEE B.  On June 21, 2013, ZANGAKANI
sent an email to AMIN at SPEC titled, "new company." The body of
the email listed the name EURAMIKA GENERAL TRADING FZE, owned by
EMPLOYEE B.

    [23] SMLS TUBE, or pipe, is a pipe without a seam or weld-
joint.  Seamless pipe can withstand higher operating pressures
and temperatures than weld pipe so it is commonly used in high
pressure systems.

was a representative for FATEH SANAT, Designer & Manufacturer of Oil, Gas, & Petrochemical Industry's Equipment located in Shiraz, Iran. Moreover, as noted above, ZANGAKANI previously sent DEHGHANI a "statement of account" indicating that Iran-based FATEH SANAT's account had been debited $360,520.99 for a payment to the Japanese company.

g. On December 16, 2013, ZANGAKANI exchanged a series of emails with the Mashreq bank representative. In the exchange, ZANGAKANI stated, "We would like to inform you that The Buyer Company 'Euramika General Trading FZE' is Established in United Arab Emirates and Goods being purchased are not Itemised in OFAC Sanctioned country." ZANGAKANI also provided the representative with the falsified invoice that had been prepared by DEHGHANI, the FATEH SANAT employee based in Shiraz, Iran.

h. After ZANGAKANI provided the fraudulent invoice to the representative, Mashreq Bank's New York branch processed the $360,520.99 transaction. According to a SWIFT message[24] and additional transaction details later provided to me by Mashreq Bank, the funds were sent from Mashreq Bank, New York branch, to an intermediary financial institution, Bank of Tokyo-Mitsubishi UFJ, LTD, New Jersey branch, and then ultimately to Bank of

---

[24] According to publicly available information, the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") network is a secure system used by financial institutions to effectuate cross-border transfers of funds electronically. To do so, instead of transmitting funds, financial institutions transmit payment orders in the form of SWIFT messages that must be settled using correspondent accounts held by the sending or receiving institutions.

Tokyo-Japan, New York branch (where the Japan-based company's correspondent U.S. bank account was held).

**K.  The Creation of New Front Companies in the U.A.E. on Behalf of Iran**

28.  Based on my review of subscriber information, digital IP address records, archived websites, and emails obtained pursuant to the Federal Search Warrants, I know that ZANGAKANI and SABRI, among others, discussed the creation of two more front companies in the U.A.E. – COMPRESSOR TECH and EXPROM - to conduct additional U.S. dollar transactions on behalf of Iran:

a.  According to an archived version of its website, COMPRESSOR TECH was a U.A.E. trading company that claimed to specialize in industrial air compressors, catalysts, air and gas dryers, gas compressors, and air separation units.  The "contact us" section of COMPRESSOR TECH's webpage provided its address as "business bay lake central building (fakhroddin) office no# 901," as well as a telephone number based in the U.A.E.[25]

b.  Exprom General Trading FZE ("EXPROM") was another front company that purported to operate in the U.A.E.  According to an auditor's report seized from ZANGAKANI's email, EXPROM was established on June 26, 2014, and was controlled and managed by Canadian national, EMPLOYEE N.[26]

---

[25] EMPLOYEE F was the "registrant contact" for COMPRESSOR TECH's website.  EMPLOYEE F repeatedly communicated with ZANGAKANI using an email address with the "@spec.ir" domain used by the Iranian oil company SPEC; as set forth above, SPEC transferred millions of U.S. dollars from Iran into Malaysia and Greece to procure piping material and oil tankers on behalf of SPEC and OIEC in 2012.

[26] Bank records show that EXPROM initiated multiple wire transfers using the exact same physical address – down to the

29. Despite their purported location in the U.A.E., emails show that COMPRESSOR TECH and EXPROM operated in conjunction with the ROSCO ENTITIES and were in fact designed to be used as front companies to disguise transactions on behalf of Iran. For example:

a. On June 8, 2014, SABRI, a COMPRESSOR TECH employee, emailed ZANGAKANI and asked him to "[r]efer to [the] confirmation of [the] managing director," and to "note" that "we're going to add Rosco's address, tell numbers and fax numbers as below in Compressor tech's letterhead & our electronic signature pls confirm."[27] SABRI also asked ZANGAKANI to "provide 2 sim cards for us (not credit sim cards) with roaming in Iran for unlimited duration as soon as possible; we need sim cards that Etisalat issues bill monthly."[28]

b. Within the email, SABRI indicated that the new address for COMPRESSOR TECH would be the same address used by ROSCO TRADING and ROSCO INVESTMENT in the U.A.E.

c. On June 10, 2014, SABRI emailed ZANGAKANI again and stated, "Further to our conversation as I explained

---

identical office number - as another company linked to ZANGAKANI in the U.A.E.: Global Elite Industrial Plant Equipment and Spare Parts Trading LLC ("GLOBAL INDUSTRIAL"). As explained further in my affidavits in support of the Federal Search Warrants, GLOBAL INDUSTRIAL's website is nearly an exact replica (including spelling and grammatical errors) of a Hong Kong company founded by ZANGAKANI called Globalelite Trading a/k/a Global Elite Inc. Limited ("GLOBAL ELITE").

[27] According to a "Director's Report" seized from one of ZANGAKANI's email accounts, COMPRESSOR TECH is not owned by any of the defendants named in my affidavit.

[28] Etisalat is an Emirates Telecommunication Group Company which operates in 15 countries across Asia, the Middle East, and Africa.

inserting Rosco's address in our letter head is ok and doesn't make problem for no one, even current address on our letter head is related to another co."

        d.    Two weeks later, on June 24, 2014, SABRI emailed ZANGAKANI again and asked him to "note we announced relocation of Compressor tech trading as following email to all business partners."  SABRI asked ZANGAKANI to please "give necessary notice to your operator" when "our partners" call a specific telephone number and "ask[] to talk with someone is compressor tech trading [sic]."

        e.    SABRI also warned ZANGAKANI not to "release [that] we're not there and we locate in Iran," because "all of suppliers supply sanctioned goods and they don't know anything about Iran at all."

        f.    SABRI instructed ZANGAKANI to advise the "operator [to] take the messages and then give our cell numbers to them, also from now on our suppliers will send original docs to this mailing address pls introduce someone at your office who'll be in contact with us for these sorts of jobs then I'll explain him/her what to do when receive the docs."  SABRI provided the same address used by the ROSCO ENTITIES in the U.A.E. and that was listed by EXPROM in invoices seized pursuant to the Federal Search Warrants.[29]

---

[29] On June 21, 2016, EXPROM sent one wire transfer of approximately $8,892 to a U.S.-based business in La Porte, Texas that specialized in turbine repairs and sales.  The FBI interviewed a representative of the company ("WITNESS 1") about the transaction.  WITNESS 1 produced an invoice for the purchase and the items were billed and shipped to COMPRESSOR TECH at the known ROSCO address that SABRI indicated COMPRESSOR TECH would

g.    Also on June 24, 2014, ZANGAKANI received an email from an employee of SPEC, the Iranian oil company, telling ZANGAKANI that the name of the "new company" was "Exprom trading FZE." After ZANGAKANI asked for information regarding the activity of EXPROM, the SPEC employee responded, "General trading, same as compressor tec."

**L.    The Conspirators Acknowledge Supplying Equipment and Providing Financial Services to SPEC in Iran**

30.    Based on my review of a series of emails and a draft memorandum of understanding ("MOU") exchanged between ZANGAKANI and KHALIL regarding a ROSCO INVESTMENT business venture in March of 2016, I know the following:

a.    In an email to ZANGAKANI (but seemingly drafted for forwarding to AMIN), KHALIL wrote that ROSCO INVESTMENT "has [a] business relationship with" SPEC – the Iranian oil company referenced above - to "do their financial services as per their written instruction."

b.    ZANGAKANI signed a copy of an MOU on behalf of ROSCO INVESTMENT for a joint venture with an Austrian company in March of 2016. In emails among KHALIL, ZANGAKANI, and AMIN, ROSCO INVESTMENT and SPEC were jointly characterized as the "first party" to the agreement.

c.    In addition, the MOU specifically identified SPEC as a "subsidiary" of PCC (another entity-listed oil company in Iran) and described the role of the "first party" (i.e. SPEC and ROSCO INVESTMENT) as "engaged in supplying equipment's [sic],

_____

use.  The transaction was processed through Bank of New York Mellon to Trustmark Bank.

compressors, pumps, hydrogen & nitrogen unites and financial services, to Oil, Gas & petrochemical companies" located in Iran.

31. Based on my review of ZANGAKANI's iCloud account, I know that ZANGAKANI saved a photograph of a chart that appears to summarize SPEC's ownership stake in a variety of front companies used by the conspirators dating back to 2010, some of which the chart described as having been "blocked in the operation process." For example:

a. According to the chart, SPEC owns 100% of PITCO Kish,[30] which in turn owns 100% of the "Excellence Business Group of Companies." The chart states that the "Excellence Business Group of Companies" owns 100% of yet another set of the "following" companies.

b. Next to these generic boxes of about twelve of the "following" companies is an asterisk which is attributed to a paragraph written in Farsi adjacent to the organizational chart. The paragraph states: "Since 2010 more than 70 companies have been opened and due to special working conditions at the moment only 12 companies are active. The other companies have been blocked in the operation process during the previous years. This process is repeated every 3-6 months."

---

[30] AMIN routinely sent ZANGAKANI memorandums written in Farsi on letterhead for "P.I.T. Corporation PITCO," with an address at Kish Island, Iran. On Iran's National Petrochemical Company website, "PITCO PIT" is listed as an owner (38.2%) of Iran-based Takht-E-Jamshid Petrochemical Company ("TJPC"). ZANGAKANI has facilitated multiple transactions on behalf of TJPC and has maintained TJPC statements of accounts. The bottom of the chart describes AMIN as the "finance manager."

32. According to a set of February 2017 meeting minutes on SPEC letterhead (seized from ZANGAKANI's iCloud account), based on the "very good performance of the ROSCO company staff, and even not losing a penny by that company, it was decided based on the board of directors of the SPEC company about payment of bonuses for 5 years of operations to [a variety of individuals including ZANGAKANI]."

**M. The Conspirators Secretly Sell $1,000,000 worth of Iranian Oil Equipment to South Korea in a Transaction Processed by a U.S. Bank**

33. Based on my review of emails obtained pursuant to the Federal Search Warrants, I also know that, starting in 2015, ZANGAKANI, SABRI, and ABTAHI began discussing a plan to sell air fin coolers - which can be used in the petrochemical industry to transfer heat from liquid or gas into ambient air - to a South Korean company ("ENERGY COMPANY 1"), on behalf of the Iranian company Babak Copper Co. ("BABAK COPPER")[31] and FATEH SANAT, the same Iranian petrochemical company mentioned above. The transaction was conducted in U.S. dollars and processed by JP Morgan Chase bank in New York.

34. As detailed below, after a series of email exchanges among SABRI, ZANGAKANI, EMPLOYEE N, ABTAHI, and ENERGY COMPANY 1 employees regarding which company would be used for the sale, the deal ultimately culminated in March of 2017 when ENERGY COMPANY 1 wired $1,000,000 to a front company selected by the

---

[31] According to a website for the Middle East & Mineral Industry Development Holding Company, BABAK COPPER is BABAK COPPER specializes in a wide range of activities to include mineral processing, import and export of goods and equipment, among other activities.

conspirators.  According to invoices, emails, and wire transfer records, the $1,000,000 was used to purchase air fin coolers from Iran-based BABAK COPPER and FATEH SANAT:

       a.   In January of 2015, SABRI and ZANGAKANI began discussing via email how to receive a $1,000,000 payment from ENERGY COMPANY 1 (in connection with a project for BABAK COPPER, as discussed further below), and they exchanged a variety of draft "invoices" regarding the payment.  The invoices were changed several times because, according to the emails, various companies that were selected to receive the payment were being phased out of "existence."

       b.   In May 2016, for example, after initially selecting a company that was supposed to receive the million-dollar payment from ENERGY COMPANY 1, SABRI asked ZANGAKANI to create a new invoice for the same payment under a different company's letterhead.

       c.   ZANGAKANI responded by providing SABRI with an invoice listing ENERGY COMPANY 1 as the "buyer" and a U.A.E. company - Prime Elite FZE ("PRIME ELITE") - as the beneficiary.[32] But the invoice provided by ZANGAKANI omitted key details about the transaction, such as the dollar amount, the date, and the seller.  The following day, SABRI responded to ZANGAKANI via email by filling in missing details on the invoice to indicate

---

[32] According to emails seized pursuant to the Federal Search Warrants, PRIME ELITE was issued a license to operate in the U.A.E. on March 9, 2015.  On September 13, 2015, KHALIL emailed ZANGAKANI a message indicating that "we have now incorporated a new company called 'Prime Elite Fze.'"  The message stated, "[p]lease also be advised that we are in the process of opening [b]ank accounts for this company.  Upon completion we will provide you with all documents along with banking information."

that ENERGY COMPANY 1 would pay PRIME ELITE a total of $1,000,000 USD.

      d.   Despite selecting U.A.E.-based PRIME ELITE as the company that would receive the ENERGY COMPANY 1 payment, emails show that the true sellers of the equipment (and beneficiaries of the transaction) were two companies based in Iran: FATEH SANAT and BABAK COPPER.

      i.   For example, in October 2016, an ENERGY COMPANY 1 representative emailed SABRI about "bank information for 'Fateh Sanat,' CCWS maker of BABAK COPPER project."[33]  The ENERGY COMPANY 1 representative told SABRI that the bank information was incorrect and had been rejected, and asked SABRI to check the bank information for PRIME ELITE again.

      ii.  In response, SABRI wrote that COMPRESSOR TECH had a current outstanding balance of $2,230,000 with ENERGY COMPANY 1.[34]  SABRI asked that COMPRESSOR TECH's outstanding balance be deducted by $1,000,000 to cover the payment owed by ENERGY COMPANY 1.

      iii. As an alternative, SABRI wrote that "[w]e have another account in Hong Kong in USD currency, which you can

---

[33] "CCWS" was not further defined by the conspirators in the emails I have reviewed to date, but according to a nuclear engineering handbook, one possible meaning for the acronym is "Component Cooling Water System."  Such systems are commonly used to aid the removal heat from systems normally containing radioactive fluids.

[34] Although the exact source of this "balance" is unclear, emails indicate that COMPRESSOR TECH previously purchased $1.4 million worth of machinery from ENERGY COMPANY 1 in connection with a different transaction in 2014, and COMPRESSOR TECH wired more than $800,000 to ENERGY COMPANY 1 in 2016, as described further below.

transfer the amount in USD currency," but "under the condition that [you] do not mention any name of Iran or compressor tech trading; otherwise both party will face problem [sic] and we cannot receive the amount."

> e.   SABRI's efforts to deduct the million-dollar payment for FATEH SANAT and BABAK COPPER from COMPRESSOR TECH's account balance were apparently unsuccessful, as the conspirators continued to attempt to find yet another company that could receive the U.S.-dollar denominated funds from ENERGY COMPANY 1:

> i.   On December 10, 2016, SABRI sent EMPLOYEE K, CHUPRA, ZANGAKANI, and EMPLOYEE N an email titled "RE: GLOBAL USD --- CCWS --- Babak Copper Project"  attaching a vendor information account form for ENERGY COMPANY 1 and an invoice regarding the sale of air fin coolers to ENERGY COMPANY 1 for $1,000,000, dated December 7, 2016.  The listed seller was Global Elite Industrial Plant Equipment and Spare Parts Trading LLC ("GLOBAL INDUSTRIAL").[35]

> ii.   The forwarded discussion indicated that CHUPRA previously provided SABRI with a U.S. dollar account number and that CHUPRA had warned SABRI not to mention Iran when depositing the funds.  CHUPRA also asked SABRI to double check the account number for each transaction to make sure the account would not be blocked.

---

[35] As detailed further in my affidavits in support of the Federal Search Warrants, GLOBAL INDUSTRIAL is purportedly a U.A.E. business that specializes in construction equipment and machinery, but its website is nearly an exact replica of the website for a Hong Kong company founded by ZANGAKANI called Globalelite Trading a/k/a Global Elite Inc ("GLOBAL ELITE").

        iii. Shortly thereafter, SABRI asked ZANGAKANI and a COMPRESSOR TECH employee to update the Excel file (vendor account form) because the account number in the invoice did not match the account number in the Excel file.

        f. Eventually, after the conspirators exchanged a series of emails indicating that PRIME ELITE might assign its interest in the million-dollar payment to GLOBAL INDUSTRIAL,[36] SABRI emailed EMPLOYEE N on February 14, 2017 with an "invoice draft with the total amount of USD 1,000,000" and asked EMPLOYEE N for "related bank account details in USD currency from Prime Elite FZE as soon as possible." SABRI asked that the invoice be prepared on PRIME ELITE letterhead with a signature and stamp. EMPLOYEE N replied, "I['']m preparing, I will send now."

        g. On March 9, 2017, ENERGY COMPANY 1 sent $1,000,000 USD to "PRIME ELITE FZE FATEH SANAT" at the National Bank of Fujairah in the U.A.E. The transaction was processed through a U.S. correspondent account held at JP Morgan Chase Bank N.A. in New York.

---

    [36] In additional emails exchanged in February 2017, for instance, SABRI explained to ZANGAKANI and ABTAHI that ENERGY COMPANY 1 required a written agreement between PRIME ELITE FZE and GLOBAL INDUSTRIAL in order to comply with Korean National Bank Foreign Exchange Transaction Law because COMPRESSOR TECH was attempting to change the payee's identity from PRIME ELITE to GLOBAL INDUSTRIAL. ABTAHI responded to SABRI's message with an email (apparently drafted for delivery to ENERGY COMPANY 1) explaining that because PRIME ELITE was (supposedly) no longer involved in the transaction, "the invoices have to be adjusted" and "there is no requirement or need for other documentation from a company that due to delay and prolongation is not anymore part of this deal." ABTAHI claimed that "[a]s the reason is that the documents are to be presented to the Korean National Bank, [w]e believe that this is the prudent way to deal with the situation."

**N.    The Conspirators Use U.S. Dollars to Buy Heavy Machinery from ENERGY COMPANY 1 on Behalf of Iran**

35.    In addition, during approximately the same time period, SABRI, ZANGAKANI, EMPLOYEE N, and CHUPRA also agreed to send millions of dollars to ENERGY COMPANY 1, in part to acquire four integrally geared compressors – which can be used in the petroleum, chemical, and gas industries – on behalf of Iran-based BABAK COPPER:

a.    On May 9, 2016, for example, ZANGAKANI received two emails from a representative of COMPRESSOR TECH.  The emails requested the payments of $750,000 and $62,743.20 to ENERGY COMPANY 1.

b.    On May 11 and May 12, 2016, EXPROM sent $62,743.20 and $750,000 to ENERGY COMPANY 1.[37]  The emails included attachments of documents on COMPRESSOR TECH letterhead which authorized the payments.  The transactions were conducted through Bank of America as the intermediary bank.

c.    On November 26, 2016, SABRI informed an ENERGY COMPANY 1 representative that a payment of $1,230,000 had been made to ENERGY COMPANY 1.  In the communication, SABRI reiterated and underlined the following: "do not mention Iran name at all" (underline in original).  On December 5, 2016, SABRI also informed EMPLOYEE K and CHUPRA of COMPRESSOR TECH's finance department that the payment to ENERGY COMPANY 1 needed to be in U.S. dollars.

---

[37] In May 2016, EXPROM sent approximately $2.4 million USD to ENERGY COMPANY 1.

d.   Also on December 5, SABRI asked ZANGAKANI to provide an invoice in the amount of $1,000,000 USD with a matching letterhead, as well as an account for the U.S.-dollar transaction.  CHUPRA forwarded the email, which included SABRI's underlined instruction to not mention Iran, to EMPLOYEE N and requested that EMPLOYEE N complete the "attached form" requested by finance.  The attached form was ENERGY COMPANY 1's vendor account information form.  The following day EMPLOYEE N sent CHUPRA the vendor request form with PRIME ELITE FZE's account information included.

e.   On December 12, 2016, EMPLOYEE N emailed CHUPRA and stated, "we got a message today [from] the [correspondent] bank that 570,000 USD is on hold and there are some inquiries from the bank they also need an invoice for the related payment."

f.   CHUPRA responded and provided an attachment.  The attachment was a commercial invoice on ENERGY COMPANY 1 letterhead.  The invoice indicated COMPRESSOR TECH had initially purchased four two-stage integrally geared compressors from ENERGY COMPANY 1 on December 30, 2014 for $1,465,000 USD for a project titled "BABAK COPPER."  According to the invoice, the third payment[38] of $570,000 USD, 39% of the contract, was due.

---

[38] The contract specified the following payment terms:  1st Payment - $146,500 (10%), 2nd Payment - $660,000 (45%), 3rd Payment - $570,000 (39%), 4th Payment - $88,500 (6%)

**O.    ZANGAKANI Uses EXPROM to Wire Funds into the Central District of California on Behalf of Iran**

36.    The conspirators also wired thousands of U.S. dollars into the Central District of California on behalf of Iran.  For example:

a.    In an email dated January 11, 2016, an employee of IRAN HOLDING COMPANY 1 emailed ZANGAKANI to ask him to transfer $66,766 to a Santa Monica, California-based company. The purpose of the transfer was for "Purchasing Electronic Equipment."

b.    On January 14, 2016, EXPROM sent $66,756 to the Santa Monica-based company with an account held at Wells Fargo Bank.  The reference information on the wire transfer details stated, "import of electronic equipment."

c.    The employee's email included a signature block indicating she represented IRAN HOLDING COMPANY 1 as a "Commercial Expert."  The email block included a +98 telephone number, the country code for Iran.  Additionally, a review of the domain and header information in the email and the WHOIS database indicated the originating IP address, 46.32.6.196, came from Iran.[39]

---

[39] The employee of IRAN HOLDING COMPANY 1 sent another email to ZANGAKANI from a different Iran-based IP address, 46.209.245.234, on February 27, 2017. In the later email, the employee sent ZANGAKANI an invoice for an Australia-based company and requested the transfer of $1,363.25. The IRAN HOLDING COMPANY 1 employee included an invoice which indicated the purchase was on behalf of an Iran-based telecommunications company.

d.     Although the registrant information was redacted, the IP block was assigned to the Oil Design and Construction Company in Iran.

## V.   **CONCLUSION**

37.   For all of the reasons described above, there is probable cause to believe that ZANGAKANI, ABTAHI, AMIN, HENAREH, KHALIL, SHAYEGH, DEHGHANI, SABRI, KARIMI and CHUPRA have committed a violation of 50 U.S.C. § 1705(a) and (c) (the International Emergency Economic Powers Act), 31 C.F.R. Part 560 (Iranian Transactions and Sanctions Regulations), and 31 C.F.R. Part 561 (the Iranian Financial Sanctions Regulations).

/S/
_____
Jacob T. Frederick
Special Agent
Federal Bureau of
Investigation

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____16th____ day of
__October__ , 2020.

_____
HON. ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

# EXHIBIT 1



Page    of

# EXHIBIT 2

## REDACTED BY ORDER OF THE COURT